IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 19, 2020

## STATE OF TENNESSEE v. NELSON YOJENI OCHOA-PUENTES

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2015-CR-426    David D. Wolfe, Judge**

_____

### No. M2019-01627-CCA-R3-CD
_____

The defendant, Nelson Yojeni Ochoa-Puentes, appeals his Dickson County Circuit Court jury conviction of attempted second degree murder, arguing that the evidence was insufficient to support his conviction and that the trial court erred by admitting evidence of his immigration status.  Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and TIMOTHY L. EASTER, JJ., joined.

William B. Lockert, III, District Public Defender (on appeal and at trial), and Josh Turnbow, Assistant District Public Defender (at trial), for the appellant, Nelson Yojeni Ochoa-Puentes.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Carey Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Dickson County Grand Jury charged the defendant with one count of attempted first degree murder.  Prior to the State's case in chief at trial, the trial court found that the language of the indictment charged attempted second degree murder despite referencing the statute for first degree murder, and the trial proceeded on the charge of attempted second degree murder.

Cheatham County Sheriff's Office Deputy William Zimmerlee testified that, on August 3, 2015, he attempted to effectuate a traffic stop on the defendant, who was driving 73 miles per hour in a 50 mile per hour zone in Cheatham County.  The defendant

did not stop his vehicle, and a chase ensued, crossing into Dickson County. At some point, Deputy Zimmerlee saw the defendant's "door starting to open on the vehicle, so I exit my vehicle." He conducted a "felony stop," exiting his cruiser with his "weapon out, ready for anything that's going to happen." As Deputy Zimmerlee neared the front of his vehicle, he "heard a pop. Sounded like gunfire. And I noticed that [the defendant] had a pistol" in his left hand. "That's when I returned fire on him." He stated that the events occurred "[v]ery quickly," with the shooting occurring approximately 20 minutes after the chase began. The events were recorded by Deputy Zimmerlee's dashboard camera, and the jury viewed the video recording, which showed the defendant exiting his vehicle, holding a gun, and briefly facing Deputy Zimmerlee's vehicle before beginning to run away.

Deputy Zimmerlee stated that he initially thought that he had fired "three or four rounds" at the defendant, but he later learned that he had fired eight rounds, hitting the defendant twice, once in his left hand and once in the upper leg. He explained that the defendant had fired first, "as soon as he got out of the vehicle," with the bullet hitting "the ground toward the angle where I'm standing." Deputy Zimmerlee believed that the defendant was attempting to shoot him and returned fire as the defendant was beginning to run away, causing the defendant to fall to the ground. Deputy Zimmerlee approached the defendant and kicked away his gun—"a Ruger .22, Mark Series .22 pistol." He also "[f]ound a knife laying a couple of feet from" the defendant, but he had not seen the knife before finding it on the ground. He did not handcuff the defendant because "[w]e had enough injuries" and he was "no longer a threat." Other officers responded within approximately five minutes.

During cross-examination, Deputy Zimmerlee testified that he first saw the defendant's gun when he heard the gunshot. When the defendant exited his vehicle, he walked toward Deputy Zimmerlee, and Deputy Zimmerlee "back[ed] up beside my vehicle for cover." The defendant fired his first shot in Deputy Zimmerlee's direction. After Deputy Zimmerlee shot the defendant, he checked for additional weapons, but he did not perform a pat down search at that time.

On redirect examination, Deputy Zimmerlee stated that he did not know why the defendant fled the attempted traffic stop. He also said that the defendant appeared to be impaired while he was driving, and he smelled of alcohol. Deputy Zimmerlee later learned that the defendant's driver's license had been revoked. He stated that he had no knowledge of the defendant's immigration status.

Tennessee Bureau of Investigation ("TBI") Agent Haidy Grigsby responded to the hospital, where he interviewed the defendant, spoke with hospital staff, and collected evidence. He took a statement from the defendant in Spanish and translated it into English and spoke with the defendant on another occasion with a doctor present to determine if the

defendant knew where he was. Agent Grigsby also provided Spanish interpretation for an interview conducted by another officer. Agent Grigsby did not ask the defendant about his immigration status.

In the defendant's statement to Agent Grigsby, he stated that, on the day of the shooting, he went to his friend's home at 4:00 p.m., where he played poker and drank Bud Lite. At 11:00 p.m., he left to go fishing and a police officer began following him. The defendant did not stop for the officer because he was scared because his vehicle registration was expired and because he was paying for the vehicle in someone else's name. The defendant stated that he had a gun with him for security because he was fishing at night. He also had two knives with him to process any fish that he caught. The defendant said that he "'started to drive faster because I was scared. I wanted to go to escape. I was going to try to make it to the river and run on foot.'" When the defendant arrived at the river, he exited his vehicle and took his gun with him because he "'didn't want to be in the for[]est without a gun.'" The defendant stated that he did not fire his gun, and before he had a chance to run, the officer shot him, and "'the gun fell out of my hand when I fell.'" The defendant also took a knife with him "'so I could survive'" in the forest. The defendant denied that he was "'looking at the police officer,'" stating that he was attempting to run. The defendant stated that he was "'100 percent sure that I didn't shoot.'" The defendant explained that he had fired his gun in that area on previous occasions and that any shell casings from his gun found at the scene were there before this incident.

TBI Agent Joey Boyd testified that he processed the crime scene in this case and interviewed the defendant. At the scene, he collected eight .40 caliber cartridge cases and a .40 caliber Glock. He also collected a .22 caliber Ruger with a bullet in the chamber and others in the magazine and .22 caliber shell casings at the scene. He noticed that "[t]here were quite a number of them I believe that showed some weathering and environmental effects," explaining that some of the casings had "rust or corrosion on the outside of them" and some "were pressed down into the dirt" and "covered with leaves." In addition to the guns and shell casings, he collected a switchblade knife.

During cross-examination, Agent Boyd identified the defendant's hunting and fishing license. In the defendant's vehicle, he found several fishing rods and other fishing gear.

On redirect examination, Agent Boyd stated that all five of the .22 caliber shell casings were fired from the defendant's gun and three of the five "appeared to have extended weather exposure." The eight .40 caliber cartridges were all fired from Deputy Zimmerlee's gun. On further cross-examination, Agent Boyd stated that five bullets were in the magazine of the defendant's gun in addition to one in the chamber.

-3-

During further direct examination, Agent Boyd explained that, based on the partial firing pin impression on the bullet collected from the chamber of the defendant's gun, he determined that the bullet had been chambered immediately after the gun was fired. On further recross-examination, he stated that the defendant's gun, a semi-automatic, automatically chambered the bullet.

By stipulation as to admissibility, the State presented a prior deportation order against the defendant.

The State rested. After a *Momon* colloquy, the defendant elected not to testify but called one witness.

Criminal Investigator Christy Dowling testified that she met with the defendant and observed him writing, signing his signature, and doing other tasks with his hands. Based on these observations, she stated that the defendant used his "right dominant hand" to perform those tasks. On cross-examination, she clarified that she did not know whether the defendant's right hand was his dominant one.

Upon this evidence, the jury found the defendant guilty of attempted second degree murder, and, after a sentencing hearing, the trial court imposed a sentence of eight years' incarceration. Following a timely but unsuccessful motion for a new trial, the defendant filed a notice of appeal. In this appeal, the defendant argues that the evidence at trial was insufficient to support his conviction and that the trial court erred by admitting evidence of his immigration status.

## I. Sufficiency of the Evidence

The defendant contends that the State failed to present sufficient evidence to establish that he acted knowingly or intentionally. The State argues that the evidence is sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record

as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As relevant here, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. Criminal attempt is committed when a person, "acting with the kind of culpability otherwise required for the offense," does one of the following:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.* § 39-11-302(b).

Here, taken in the light most favorable to the State, the evidence adduced at trial established that Deputy Zimmerlee spotted the defendant speeding and attempted to effectuate a traffic stop. The defendant failed to stop and led Deputy Zimmerlee on a chase for approximately 20 minutes. When the defendant stopped his car, he exited his vehicle while holding a gun in his left hand and fired at least one shot in the direction of Deputy Zimmerlee—who was outside of his vehicle at that point. Deputy Zimmerlee returned fire as the defendant was beginning to flee the scene. This evidence is sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant knowingly attempted to kill Deputy Zimmerlee.

## II. Evidence of Immigration Status

Next, the defendant contends that the trial court erred by admitting evidence of his immigration status. The State argues that the defendant waived this issue by failing

to argue the issue in his brief.  Alternatively, the State argues that the trial court did not err.

Here, because the defendant failed to argue this issue in his appellate brief, this issue is waived.  *See* Tenn. R. App. P. 27(a)(7) ("The brief of the appellant shall contain . . . [a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . ."); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE